UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW YORK, | CASE NO.: |
| *Plaintiffs*, | JUDGE: |
| v. | |
| STERICYCLE, INC., SAMW ACQUISITION CORPORATION, and HEALTHCARE WASTE SOLUTIONS, INC., | DECK TYPE:   Antitrust |
| *Defendants*. | DATE STAMP: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I.   NATURE AND PURPOSE OF THE PROCEEDING

Defendant Stericycle, Inc., through SAMW Acquisition Corporation, and defendant Healthcare Waste Solutions, Inc. ("HWS"), entered into a merger agreement dated September 24, 2010, pursuant to which Stericycle would acquire all of HWS, except for an incinerator in Matthews, North Carolina, for $245 million.

The United States and the State of New York filed a civil antitrust Complaint on April 8, 2011, seeking to enjoin the proposed acquisition, alleging that it likely would substantially lessen competition in the provision of infectious waste treatment services to customers in the New York City Metropolitan Area, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.   The loss

of competition from the acquisition likely would result in higher prices and reduced service for these customers of infectious waste treatment services.

At the same time the Complaint was filed, the United States and the State of New York also filed a Hold Separate Stipulation and Order and proposed Final Judgment, which are designed to eliminate the anticompetitive effects that would result from Stericycle's acquisition of HWS. Under the proposed Final Judgment, which is explained more fully below, Stericycle is required to divest HWS's transfer station located in the Bronx, New York. Under the terms of the Hold Separate Stipulation and Order, Stericycle and HWS must take certain steps to ensure that the assets being divested continue to be operated in a competitively independent and economically viable manner and that competition for infectious waste treatment services is maintained during the pendency of the ordered divestiture.

The United States, the State of New York, and the defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the Final Judgment and to punish violations thereof.

## II.   DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.   The Defendants

Stericycle is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Stericycle, a multi-national company, is the largest provider of infectious waste treatment services in the United States, with operations in all 50 states, including 54 treatment

facilities. In 2009, Stericycle had U.S. revenues of $913 million. SAMW Acquisition Corporation is a corporation formed by Stericycle to facilitate its acquisition of HWS.

HWS is a Delaware corporation with its principal place of business in Cincinnati, Ohio. HWS is the second-largest provider of infectious waste treatment services in the United States, with operations in 15 states that include six treatment facilities. In 2009, HWS had total revenues of about $31 million.

### B. The Competitive Effect of the Acquisition on Infectious Waste Treatment Services

#### 1. *Background*

Regulated medical waste is waste generated in the diagnosis, treatment, or immunization of human beings or animals. There are generally three types of regulated medical waste: (1) infectious waste; (2) pathological waste; and (3) trace chemotherapy waste. Infectious waste is waste that has come into contact with bodily fluids and "sharps" waste, such as syringes and scalpels. Pathological waste is anatomical parts, and trace chemotherapy waste is small amounts of chemical compounds used to treat cancer patients and the equipment used to administer the compounds. Infectious waste comprises approximately 90 percent of the regulated medical waste generated in the United States.

State and federal governments heavily regulate the treatment of regulated medical waste. They prescribe how each type of regulated medical waste must be stored, collected, and treated. Providers of infectious waste treatment services are required to be licensed by various state and federal regulatory agencies before they can offer such services. Regulated medical waste must be stored separately from other types of waste, and each type of regulated medical waste must be

stored separately from the other types in specially marked and sealed containers. State-approved treatment facilities must be used to render infectious waste non-infectious. Failure to use state-approved treatment facilities subjects both the generator of the infectious waste and the infectious waste treatment service provider to criminal prosecution, fines, damage actions, and potentially high clean-up costs.

Autoclave sterilization is the most common treatment for infectious waste. An autoclave uses steam sterilization combined with pressure to render infectious waste non-infectious. Autoclave sterilization is not approved for pathological or trace chemotherapy waste, which instead must be incinerated in a specially licensed medical waste incinerator.

Infectious waste is typically collected from generator sites (e.g., hospitals and physician offices) on daily route trucks and then transported to treatment facilities. Route trucks are vans and, more typically, 16- to 24-foot straight trucks. A daily route truck typically travels a route within a 75- to 100-mile radius of its garage.

Obtaining approval for an infectious waste treatment facility in and around large urban areas, such as New York City, is difficult. Only one such commercial facility operates in the New York City Metropolitan Area. Transporting large volumes of infectious waste to distant treatment facilities using daily route trucks is not cost-effective. Therefore, service providers serve such areas by using local transfer stations. Once the daily route truck has delivered the infectious waste to a local transfer station, the collection function is completed. At a transfer station, containers of infectious waste are unloaded from the daily route trucks and loaded onto tractor trailers for efficient shipment to more distant treatment facilities.

The size of the market for the provision of infectious waste treatment services is largely influenced by transportation costs because such costs represent a large share of the total cost of providing treatment services. Defendants Stericycle and HWS own and operate numerous autoclave facilities for the treatment of infectious waste. Stericycle's and HWS's closest facilities to New York City are located in Sheridan and Oneonta, New York; Woonsocket, Rhode Island; and Morgantown and Marcus Hook, Pennsylvania. The closest of these is about 180 miles from New York City. It is not cost-effective to transport large volumes of infectious waste to these distant facilities using daily route trucks.

Stericycle and HWS operate local transfer stations in and around New York City and compete to provide infectious waste treatment services by serving customers through these local transfer stations. In and around New York City, Stericycle owns and operates local transfer stations in the Bronx, Staten Island, West Babylon, and Farmingdale, New York. Stericycle also owns local transfer stations in Piscataway and Bloomfield, New Jersey. HWS owns and operates a local transfer station in the Bronx, New York.

In the New York City Metropolitan Area, encompassing the City of New York, and the counties of Westchester, Rockland, Nassau, and Suffolk in New York, the counties of Hudson, Bergen, Passaic, Essex, Union, and Middlesex in New Jersey, and the county of Fairfield in Connecticut, apart from one small competitor, no other infectious waste treatment service provider has a local transfer station located within approximately 100 miles of Stericycle's or HWS's local transfer stations.

2.  *Relevant Market*

The provision of infectious waste treatment services to customers in the New York City Metropolitan Area is a line of commerce and relevant price discrimination service market within the meaning of Section 7 of the Clayton Act. Infectious waste treatment differs from treatment for other types of waste, including other types of regulated medical waste. There are no legal alternatives to treating infectious waste other than using an approved treatment technology, such as autoclave sterilization.

Defendants provide infectious waste treatment services to New York City Metropolitan Area customers using local transfer stations. Other infectious waste treatment service providers that operate treatment facilities more than 100 miles from the New York City Metropolitan Area cannot cost-effectively compete to provide infectious waste treatment services without a local transfer station located in the New York City Metropolitan Area. A small but significant increase in the price of infectious waste treatment services would not cause New York City Metropolitan Area customers to move sufficient volumes of infectious waste to another type of treatment service, or to switch to an infectious waste treatment service provider that does not operate a local transfer station, in sufficient numbers so as to make such a price increase unprofitable. The relevant market is the provision of infectious waste treatment services to customers in the New York City Metropolitan Area.

3.  *Anticompetitive Effects of the Transaction*

In the New York City Metropolitan Area, the acquisition would remove a significant competitor in the treatment of infectious waste in an already highly concentrated market. The proposed acquisition would reduce from three to two the number of competitors with local

transfer stations, and Stericycle and HWS would have approximately 90 percent of the infectious waste treatment market in the New York City Metropolitan Area. Vigorous price competition between Stericycle and HWS in the provision of infectious waste treatment services has benefited customers in the New York City Metropolitan Area. The third competitor is a small firm that opened an autoclave treatment facility in Mount Vernon, New York, in 2010; it is unlikely to replace the competition lost as a result of the merger.

The proposed acquisition will eliminate the competition between Stericycle and HWS and enable Stericycle to raise prices and lower quality of service for customers in the New York City Metropolitan Area, in violation of Section 7 of the Clayton Act.

### 4. *Entry into the Treatment of Infectious Waste*

Successful entry into the provision of infectious waste treatment services for customers in the New York City Metropolitan Area is unlikely without first obtaining a local transfer station from which waste can be transferred to more distant treatment facilities.

A prospective provider of infectious waste treatment services faces substantial barriers to site and build a transfer station. Obtaining the state and local permits and approvals necessary to site an infectious waste transfer station would require a substantial investment in time and money, without any guarantee that the permits and approvals would ultimately be granted. In recent years, several infectious waste treatment service providers have attempted without success to obtain the necessary permits to site a local transfer station within New York City.

Entry into the provision of infectious waste treatment services to customers in the New York City Metropolitan Area would not be timely, likely, or sufficient to counter anticompetitive

price increases or diminished quality of service that Stericycle could impose after the proposed acquisition.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The terms of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition alleged in the Complaint. Section IV of the proposed Final Judgment requires defendants, within forty-five (45) days after the filing of the Complaint, or five (5) days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest HWS's transfer station in the Bronx, New York, which is used in the provision of infectious waste treatment services to customers in the New York City Metropolitan Area. The acquirer of the transfer station, along with associated tangible and intangible assets, must be acceptable to the United States, in its sole discretion after consultation with the State of New York. The divestiture of these assets according to the terms of the proposed Final Judgment will establish a new, independent, and economically viable competitor, thereby preserving competition in the provision of infectious waste treatment services to customers in the New York City Metropolitan Area.

In the event that defendants do not accomplish the divestiture within the time prescribed in the proposed Final Judgment, the proposed Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestitures. If a trustee is appointed, the proposed Final Judgment provides that defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court,

United States, and the State of New York as appropriate, setting forth his or her efforts to accomplish the divestitures. At the end of six months, if the divestitures have not been accomplished, the trustee, the United States, and the State of New York, will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

The Final Judgment also requires, in Section VIII, that defendants provide advance notification of certain future proposed acquisitions not otherwise subject to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a. That provision requires 30 days' advance written notice to the United States and the State of New York before defendants acquire, directly or indirectly, (1) interest in any business engaged in the treatment of infectious waste that serves the New York City Metropolitan Area; (2) other than in the ordinary course of business, assets of a person engaged in the treatment of infectious waste generated in the New York City Metropolitan Area; or (3) capital stock or voting securities of any person that, at any time during the twelve (12) months immediately preceding such acquisition, was engaged in the treatment of infectious waste generated in the New York City Metropolitan Area, where that person's annual revenues in this area from the treatment of infectious waste were in excess of $500,000. With this provision, the United States and the State of New York will have knowledge in advance of acquisitions that may impact competition in the provision of infectious waste treatment services in the New York City Metropolitan Area.

### IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act (15 U.S.C. § 15) provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act (15 U.S.C. § 16(a)), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against the defendants.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States, the State of New York, and the defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the *Federal Register*.

Written comments should be submitted to:

> Maribeth Petrizzi
> Chief, Litigation II Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, NW, Suite 8700
> Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. The United States could have commenced litigation and sought a judicial order enjoining the acquisition of HWS by Stericycle. The United States is satisfied that the divestiture and other relief described in the proposed Final Judgment will preserve competition in the provision of infectious waste treatment services for customers in the New York City Metropolitan Area. The relief contained in the proposed Final Judgment would achieve all or substantially all of the relief that the United States would have obtained through litigation, while avoiding the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public

interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR), at *3, (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable").

As the United States Court of Appeals for the District of Columbia has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the allegations set forth in the government's complaint, whether the decree is sufficiently clear,

whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[1] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer–Daniels–Midland*

---

[1] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the

*Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case); *United States v. Republic Serv., Inc.*, 2010-2 Trade Cas. (CCH) ¶ 77,097, 2010 U.S. Dist. LEXIS 70895, No. 08-2076 (RWR), at *160 (D.D.C. July 15, 2010) (finding that "[i]n light of the deferential review to which the government's proposed remedy is accorded, [amicus curiae's] argument that an alternative remedy may be comparably superior, even if true, is not a sufficient basis for finding that the proposed final judgment is not in the public interest.").

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). Therefore, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *Republic Serv.*, 2010 U.S. Dist. LEXIS 70895, at *158 (entering final judgment "[b]ecause there is an adequate factual foundation upon which to

---

decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

14

conclude that the government's proposed divestitures will remedy the antitrust violations alleged in the complaint.").

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As this Court confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." 489 F. Supp. 2d at 15.

In its 2004 amendments to the Tunney Act,[2] Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C.

---

[2] The 2004 amendments substituted the word "shall" for "may" when directing the courts to consider the enumerated factors and amended the list of factors to focus on competitive considerations and address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

§ 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

## VIII.   <u>DETERMINATIVE DOCUMENTS</u>

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

Dated: April 8, 2011

Respectfully submitted,

*/s/ Lowell Stern*

Lowell R. Stern (D.C. Bar #440487)
U.S. Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street, N.W., Suite 8700
Washington, DC 20530
Tel.:  (202) 514-3676
Email:  lowell.stern@usdoj.gov